**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

**LIJKEL DIJKSTRA**,

        Plaintiff,

      v.                                    **Civil Action No. 5:11-CV-152**
                                                          Judge Bailey

**HARRY J. CARENBAUER**; **HOME**
**LOAN CENTER**, dba Lendingtree Loans;
**HLC ESCROW**; **LENDERS FIRST CHOICE**;
**CHASE HOME FINANCE, LLC**; **WILSHIRE**
**CREDIT CORPORATION**; **MERRILL LYNCH**
**MORTGAGE LENDING, INC.**; **LaSALLE BANK,**
**N.A.**; and **DANIEL J. MANCINI**,

        Defendants.

### MEMORANDUM OPINION AND ORDER RESOLVING MOTIONS

Pending before this Court are defendants' Motion to Decertify the Class [Doc. 159],

Defendants Home Loan Center, Inc., HLC Escrow, and Harry J. Carenbauer's Motion for

Partial Summary Judgment [Doc. 161], and Plaintiff's Motion for Summary Judgment on

Class Claims [Doc. 163]. The Motions have been fully briefed and are ripe for decision.

### Procedural History

Plaintiff originally filed his Complaint in the Circuit Court of Ohio County, West

Virginia, on or about November 7, 2008. The action was removed and remanded and then

removed to this Court again on October 28, 2011.

The Complaint alleges unauthorized practice of law, violation of the West Virginia

1

Consumer Credit and Protection Act ("WVCCPA"), and various torts. Along with plaintiff's individual claims, the Complaint also seeks damages on behalf of a class. This action was originally brought by plaintiff against two individuals and ten financial institutions. HLC and HLC Escrow are the only two business-entity defendants remaining in this action, and Mr. Carenbauer is the only individual remaining in the suit. All of the defendants except HLC, HLC Escrow, and Mr. Carenbauer have reached agreements to resolve this lawsuit with plaintiff.

On January 3, 2013, this Court entered its Order Granting Conditional Class Certification [Doc. 127]. The Court certified the following class:

> All West Virginia consumers who obtained mortgage loans through LendingTree, and whose loans were closed by persons not admitted to the practice of law in West Virginia or by persons not under the direct supervision of a lawyer admitted to the practice of law in West Virginia, and whose loans were in effect at any time after November 8, 2007.

[Doc. 127, p. 6]

The Court found that the following questions were common to all potential class members:

> (1) whether LendingTree's "witness only" closings constitute unauthorized practice of law;
>
> (2) whether class members are entitled to statutory penalties for each violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-5-101, -6-102, -104;
>
> (3) whether LendingTree should be held in contempt of court for engaging in the

2

unauthorized practice of law;

(4) whether fees paid to LendingTree for the laypersons' closing services should be refunded or disgorged; and

(5) whether class members are entitled to injunctive relief and other equitable remedies.

[Doc. 127, p. 11].

The defendants sought permission to appeal the class certification to the United States Court of Appeals for the Fourth Circuit, which permission was denied by the Court [Doc. 129].

With respect to their Motion to Decertify the Class, the defendants contend that the conditional class no longer satisfies the requirements of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, based upon evidence brought to light in discovery.  In particular, the defendants argue:

1.      That discovery has revealed that all but eight of the class members' loans were closed before the West Virginia Supreme Court of Appeals decided ***McMahon v. Advanced Title Servs. of W.Va.***, No. 101027 (W.Va. Jan 11, 2011 (*nunc pro tunc* Nov. 17, 2010)), which held that the Circuit Court of Brooke County's Stipulation and Order entered March 31, 2010, was "plainly right;"

2.      That the legal standard for unauthorized practice claims differs for loans closed before and after November 17, 2010;

3.      That there is an individualized fact specific inquiry for claims arising from loans closed before November 17, 2010; and

4. The class representative cannot adequately represent the interests of the class since he lacks a legitimate claim for the unauthorized practice of law.

In response, the plaintiff argues:

1. That all of the facts which were disclosed by discovery were known by the Court at the time that the class was conditionally certified;

2. That the same standard applies to loans closed before and after November 17, 2010; and

3. That Mr. Dijkstra remains an adequate class representative with a valid claim for unauthorized practice.

With respect to Defendants Home Loan Center, Inc., HLC Escrow, and Harry J. Carenbauer's Motion for Partial Summary Judgment, the defendants seek summary judgment as to Count I (Declaratory Judgment), in which plaintiff seeks an order decreeing that the practice of using non-lawyers not under the direct supervision of a licensed attorney constitutes the unauthorized practice of law; Count II (Contempt), in which plaintiff seeks an order holding defendants in contempt for the alleged unauthorized practice of law; Count III (Injunctive Relief), which seeks an order enjoining defendants from engaging in the practice of law and violating the laws of West Virginia; Count IV (Conversion), in which plaintiff seeks recovery for HLC allegedly profiting or benefitting from monies that were placed under its supervision and control and that were property of the plaintiff, based on plaintiff's theory that money paid to defendants as "true costs" were for unlawful, worthless or non-existent products or services; Count V (Overcharging), in which plaintiff seeks recovery for certain fees or expenses related to the loan transaction; Count VI (Breach of Fiduciary Obligations), in which plaintiff contends that the defendants breached a fiduciary

duty owed to him in closing the loan; Count VII (Fraud/Intentional Misrepresentation), in which plaintiff contends that defendants allegedly engaged in the unauthorized practice of law and used an allegedly inflated appraisal; Count VIII (Misrepresentation by Concealment or Fraud), in which plaintiff seeks recovery for alleged concealment of material facts; Count IX (Negligent Misrepresentation), in which plaintiff seeks recovery for misrepresentations and omissions constituting negligent misrepresentation; Count X (Committing Unfair and Deceptive Trade Practices in Violation of W.Va. § 46A-1-101, et seq. (the "WVCCPA")), in which plaintiff claims that defendants engaged in the unauthorized practice of law, charged more than $2 total for Mr. Carenbauer's appearance, and originated a loan in excess of the value of Plaintiff's home;

Count XI (Violation of W.Va. § 37-17-1, et seq., the West Virginia Mortgage Lender, Broker and Services Act), in which the plaintiff seeks recovery for allegedly charging fees not permitted by the Act; Count XII (Civil Conspiracy), which is derivative of other claims; Count XIII (Tort of Outrage), which defendants claim is derivative of other claims; Count XIV (Negligence), which defendants claim also is derivative of other claims; Count XV (Class Action), in which plaintiff alleges that class action treatment is appropriate; and Count XVI (Punitive Damages), in which plaintiff asserts that HLC and HLC Escrow's alleged conduct was willful, wanton, intentional and/or reckless. The moving defendants seek summary judgment as to all claims concerning the alleged unauthorized practice of law and the alleged overcharging of notary services. Specifically, consistent with the argument set out below, defendants seek summary judgment with respect to Counts I, II, III, IV, V, VI, VII, VIII, IX, XII, XIII, XIV, XV, and XVI in their entirety and with respect to those portions of Counts X and XI further specified herein. Defendants are not moving for

dispositive relief based on plaintiff's appraisal-related claims, but reserve the right to so at an appropriate juncture.

As noted above, the primary theories presented by the Motion are the unauthorized practice of law and the claim under the WVCCPA for overcharging for notary services. The only Counts which were conditionally certified for class treatment are Counts I, II, V and X. The remainder of the claims are presented on an individual basis.

The third pending Motion is Plaintiff's Motion for Summary Judgment on Class Claims, which turns on the same issues presented by the defendants' summary judgment motion.

**Individual Facts**

In May 2005, Plaintiff borrowed $114,350 from HLC as part of a loan refinancing. In connection with the closing of the loan, HLC hired a third party to present loan documents to borrowers for the signing portion of the loan closing process. Harry Carenbauer was the notary public engaged by a third party to gather signatures from Plaintiff on HLC's behalf. On May 25, 2005, Mr. Carenbauer went to plaintiff's residence to witness plaintiff sign necessary loan documents. Mr. Carenbauer presented the documents to plaintiff, and plaintiff signed the documents.

At no time while attending to the signing portion of the loan closing did Mr. Carenbauer hold himself out as a lawyer or provide any legal advice. Mr. Carenbauer handed documents to plaintiff and showed him where he needed to sign his name, or, if necessary, affix his initials. Mr. Carenbauer did not explain anything to plaintiff about the loan transaction or instruct plaintiff about the meaning of any terms contained in the document. Plaintiff asked no questions of Mr. Carenbauer.

Mr. Dijkstra was born in the Netherlands and moved to the United States when he was 28 years old. He had little formal education and enlisted in the Navy at the age of fifteen. Mr. Dijkstra never had any formal instruction in the English language, but learned it "on the streets."

Mr. Dijkstra expected that his loan closing would be handled by an attorney and specifically asked Mr. Carenbauer whether he was an attorney. Mr. Carenbauer responded that he was a notary. Mr. Carenbauer then proceeded to tell Mr. Dijkstra that "[a]ll I need from you is signatures" and hurried through the closing. Mr. Dijkstra testified that, unlike at previous loan closings where an attorney had handled the transaction, Mr. Carenbauer was unable to explain anything to him at the closing. Mr. Dijkstra further stated that an attorney would have explained to him what an adjustable rate mortgage was and that his interest rate was set to *increase* to 12% with the new loan - frustrating Mr. Dijkstra's intention in getting the loan, which was to *decrease* his interest rate. Mr. Dijkstra attempted to review the documents the evening after the closing, but "didn't know what it all meant."

James Pittenger, LendingTree's Vice President of Processing and Vendor Services, testified that LendingTree's policy at loan closings was to have the loan-closer notary instruct the borrower how to execute the closing documents and ensure that the documents had been properly executed. ("The notary or attorney that is witnessing the signing of loan documents will oftentimes review the document or look at the document to ensure it was signed where it needed to be. And I would assume in many cases if a signature is missed, that they would instruct the borrower to sign where they had missed.")

LendingTree required notaries to follow a "Signing Review Checklist." This checklist

was developed for the notary to "ensure that the signing has been completed properly." The checklist went on to identify documents and require the notary to certify that the documents had been signed and completed in their entirety.

Mr. Carenbauer testified that he understood his role at closings to be to instruct the borrower how to sign the documents and obtain the borrower's signatures on those documents. Mr. Carenbauer said "[a]s I go through each page, when it became (sic) a signature, I instructed him where to sign." He would make sure that documents were properly signed. ("What documents I got, all I would have to do is make sure it was signed where it needed to be signed, initialed.").

With respect to Plaintiff's fee claims, LendingTree charged Mr. Dijkstra a $110 "notary fee" for the closing of his loan. After he obtained Mr. Dijkstra's signatures, Mr. Carenbauer testified that it was his practice to give an unsigned set of the documents to the borrower and then send the signed versions "overnight" to the lender. He further testified that to send the documents back: "either I would download a prepaid that you—that you put into an envelope that would pay for it to go back, or they would send me one with a prepaid envelope. I would put the notarized copies in the envelope and send it." He did not maintain any documents related to any of the closings that he performed. Mr. Dijkstra paid an additional messenger fee of $30.00 for this service. Similarly, class members paid between $90.00–$275.00 for notary charges.

### Discussion

One of the central and overriding issues in this litigation is whether a "witness-only" closing conducted by a notary public who is not a lawyer, who is not an employee of the lender, and who is not acting under the direct supervision of a lawyer is the unauthorized

8

practice of law. It is clear that such a closing is, in fact, the unauthorized practice of law. Defendants contend that this only became the case in November of 2010, when the West Virginia Supreme Court of Appeals issued its Order in **McMahon v. Advanced Title Servs. of W.Va.**, No. 101027 (W.Va. Jan 11, 2011 (*nunc pro tunc* Nov. 17, 2010)), which held that the Circuit Court of Brooke County's Stipulation and Order entered March 31, 2010, was "plainly right." This Court cannot agree.

In March, 2003, the Committee on Unauthorized Practice of Law issued its Opinion No. 2003-01 [Doc. 108-1]. This Opinion clearly stated that "it is *inherent at the closing itself* that buyers and sellers will have questions about the transaction and the documents, which answers necessarily go to their respective legal rights and obligations. Such answers are advising on legal matters." While the defendants rely upon the fact that the plaintiff did not ask any questions, the fact remains that there was noone present of whom to ask questions. The 2003 opinion concluded that "[i]t is clear that as a whole, *real estate closings are the practice of law*. The Committee presumes that significant harm to the public occurs just by the practice of law by lay persons and holds such practice to be the unauthorized practice of law." (emphasis added).

It is important to note that the Committee on Unauthorized Practice of Law is "an agency of the Supreme Court of Appeals of West Virginia ('Supreme Court of Appeals' or 'Supreme Court') whose purpose, in part, is to enforce the rules prescribed by the Supreme Court for the definition of the practice of law in West Virginia. W.Va.Code § 51-1-4a(a) and (d). The Committee is a permanent committee of the State Bar and has 'jurisdiction over all matters and questions which may be considered as constituting the unlawful practice

of law under the definition of the practice of law adopted by the supreme court of appeals of West Virginia.' West Virginia State Bar, Bylaws, art. VII., § 1." ***Allstate Ins. Co. v. West Virginia State Bar***, 998 F.Supp. 690, 691 (S.D. W.Va. 1998) (Haden, J.), ***affirmed***, 233 F.3d 813 (4th Cir. 2000).

Thereafter, Brooke County Circuit Judge Martin Gaughan, in ***McMahon v. Advanced Title Servs. Co.***, Brooke County No. 01-C-121, certified certain issues to the West Virginia Supreme Court of Appeals.  The Supreme Court vacated the rulings on the questions and remanded for factual development, noting that "[n]othing in this opinion is intended to alter the long-established and necessary role of licensed West Virginia attorneys in preparing legal documents, in examining and certifying real estate titles, and in assuring that real estate and loan transactions are conducted in accord with the law." ***McMahon v. Advanced Title Servs. Co.***, 216 W.Va. 413, 420, 607 S.E.2d 519, 526 (2004).

The Court also noted "that in West Virginia, the judicial branch determines what is and is not the unauthorized practice of law.  See ***Daily Gazette Co. v. Comm. on Legal Ethics,*** 174 W.Va. 359, 326 S.E.2d 705 (1984).  *See also* ***Allstate Insurance Company v. The West Virginia State Bar***, 998 F.Supp. 690 (S.D. W.Va. 1998), *aff'd,* 233 F.3d 813 (4th Cir. 2000).  This includes the authority to define, sanction, enjoin, and otherwise address the unauthorized practice of law.  ***West Virginia State Bar v. Earley***, 144 W.Va. 504, 109 S.E.2d 420 (1959)."  216 W.Va. at 418, 607 S.E.2d at 524.

In ***Allstate Ins. Co. v. West Virginia State Bar***, 233 F.3d 813 (4th Cir. 2000), the Fourth Circuit stated:

The regulation of the practice of law is entrusted in West Virginia to the Supreme Court of Appeals and those judicial bodies under that court subject to its orders, of which the committee on unlawful practice is one. It is difficult to conceive a matter closer or more important to the State of West Virginia, not to mention her people, than the question of who is to practice law in that State.

233 F.3d at 820.

On March 32, 2010, Judge Gaughan entered a Stipulation and Agreed Order in *McMahon* [Doc. 108-3], which stated, *inter alia*:

"[A] number of documents executed at a real estate closing materially affect the legal rights and obligations of the parties to a real estate transaction," and that "*inherent in a real estate closing that legal issues may arise requiring explanation or discussion.*" [Doc. 108-3, p. 9] (emphasis added).

As Judge Gaughan explained:

While some documents executed at a real estate closing may be self explanatory to a person of average intelligence, other more complex documents included within the process require the *special skills and knowledge of those within the legal profession to be able to explain their applicability and effect on an individual's legal rights and obligations, such as the borrowers and lenders obligations, rights and duties under the deed of trust and promissory note.*

There is a risk to the parties of a real estate closing in having documents affecting legal rights and obligations explained by those without the

11

necessary legal knowledge and skill.

[Doc. 108-3, p. 9] (emphasis added).

Judge Gaughan concluded:

It is the practice of law for a person to conduct a real estate closing (*including "witness-only" or "witness closing"*) for mortgage financing and real estate transactions, to or for the general consumer public or any third-party, when part of his or her responsibilities as closing agent consist of: (1) explaining, interpreting, giving an opinion and/or advising another on the meaning of terms are principles (legal or otherwise) relevant to the mortgage transaction, or in matters involving the application of legal principles to particular facts, purposes or desires; *(2) instructing clients in the manner in which to execute legal documents; or* (3) preparing the HUD-1 Settlement Statement, and at times, other instruments related to mortgage loans and transfers of real property and such activity may only be conducted by an attorney licensed to practice law in the state of West Virginia, or by a person acting under his or her direct supervision and control, or by a bona fide full-time lay employee performing legal services for his or her regular employer in compliance with the State Court Rules.

Notwithstanding the standardization of real estate closing documentation, *the settlement agent may not present important legal documents of the seller, buyer, borrower and/or lender of the closing without legal questions being asked and without giving legal advice.*

[Doc. 108-3, at p. 15 & 16]  (emphasis added).

12

The Agreement also stated that the court had held on September 26, 2003 that "performing real estate closings" and other services "constituted the practice of law." *Id.* p.2.

On November 17, 2010, the Supreme Court affirmed the Agreed Order as "plainly right" without any discussion. (*McMahon v. Advanced Title Servs. Co. of W. Va.*, No. 101027, slip op. (W. Va. 2011) [Doc. 108-2].

Also in 2010, the Committee on Unlawful Practice issued an Opinion stating that, as the Supreme Court had also concluded, Judge Gaughan's order was "plainly right" and *in accordance with "[p]rior opinions of this committee [that] have clearly indicated that the activity of conducting a real estate closing [is] the practice of law and cannot be conducted by a lay person*[.]" West Virginia State Bar, Advisory Op. 2010-002 (Am.) (emphasis added) [Doc. 108-4].

The holdings by the Unlawful Practice Committee and the West Virginia Courts did not occur in a vacuum. Other courts throughout the country reached the same or similar results. At the time that the Unlawful Practice Committee issued its 2003 Opinion, real estate closings had been held the practice of law in numerous states. In *State v. Buyers Service Co., Inc.*, 292 S.C. 426, 357 S.E.2d 15 (1987), the Supreme Court of South Carolina held that instructing persons in the manner in which to execute legal documents is itself the practice of law. The South Carolina Court then stated:

> Courts of other jurisdictions have recognized dangers in allowing lay persons
> to handle real estate closings. *See, e.g., Bowers v. Transamerica Title Ins.*
> *Co.,* 100 Wash.2d 581, 675 P.2d 193 (1983); *Coffee County Abstract and*

*Title Co. v. State ex rel. Norwood,* 445 So.2d 852 (Ala.1984); *Conway-Bogue Realty Inv. Co. v. Denver Bar Ass'n,* 135 Colo. 398, 312 P.2d 998 (1957); *Oregon State Bar v. Security Escrows, Inc.,* 233 Or. 80, 377 P.2d 334 (1962); *New Jersey State Bar Ass'n v. Northern N.J. Mortgage Assocs.,* 32 N.J. 430, 161 A.2d 257 (1960).

While some of these cases hold that lay persons may conduct closings, they note that giving advice as to the effect of the various instruments required to be executed constitutes the unauthorized practice of law. Thus, in *Coffee County Abstract and Title Co., supra,* the title company was permitted to conduct real estate closings with the restriction that no legal advice or opinions be given. Chief Justice Torbert, concurring, gave instructions as to how such a closing should be handled: "If the parties to the transaction raise a legal question at the closing, the title company should stop the proceeding and instruct them to consult their attorneys." 445 So.2d at 857.

We agree this approach, in theory, would protect the public from receiving improper legal advice. However, there is in practice no way of assuring that lay persons conducting a closing will adhere to the restrictions. One handling a closing might easily be tempted to offer a few words of explanation, however innocent, rather than risk losing a fee for his or her employer.

We are convinced that real estate and mortgage loan closings should

be conducted only under the supervision of attorneys, who have the ability

to furnish their clients legal advice should the need arise and fall under the

regulatory rules of this court.  Again, protection of the public is of paramount

concern.

292 S.C. at 433-434, 357 S.E.2d at 19.  *See also **Massachusetts Conveyancers Ass'n,***

***Inc. v. Colonial Title & Escrow, Inc.**, 13 Mass.L.Rptr. 633, 2001 WL 669280 (Mass.

Super. Ct.  June 5, 2001);  Formal Advisory Opinion No. 04-1, 626 S.E.2d 480 (Ga. 2006);

**The Florida Bar v. Columbia Title of Florida**, 197 So. 2d 3 (Fla. 1967);  **Hancock v.

Citifinancial, Inc.**, 2005 WL 1653775 (July 6, 2005) (explaining **In re Mid-Atlantic

Settlement Services, Inc.**, 755 A.2d 389 (2000) (Table).

Based upon the foregoing, it is the opinion of this Court that the Supreme Court of

Appeals, acting through its Committee on Unlawful Practice has found that the closing of

real estate loans by persons who are not licensed attorneys, who are not acting under the

direct supervision of a licensed attorney, and who are not a bona fide full-time lay employee

performing legal services for his or her regular employer constitutes the unlawful practice

of law since at least 2003.

This Court is aware of its own decision in **Shelton v. Wells-Fargo Bank**, 2010 U.S.

Dist. Lexis 143609 (N.D. W.Va. August 13, 2010), where this Court noted that the notary

in that case provided simply ministerial and clerical functions which did not constitute the

unauthorized practice of law.  In that decision, this Court unfortunately misread the 2003

opinion of the Unlawful Practice Committee and was wrong.

This Court also rejects the argument that the **McMahon** Order [Doc. 108-3] was by

its own terms prospective. This Court finds no basis for that assertion, other than it is unclear whether any relief was awarded against the defendant in that case.

Given this Court's ruling on the central issue, it becomes incumbent upon this Court to apply that ruling to the various pending Motions.

**Motion to Decertify the Class [Doc. 159]**

As noted above, in this Motion, the Movants argue:

1. That discovery has revealed that all but eight of the class members' loans were closed before the West Virginia Supreme Court of Appeals decided ***McMahon v. Advanced Title Servs. of W.Va.***, No. 101027 (W.Va. Jan 11, 2011 (*nunc pro tunc* Nov. 17, 2010)), which held that the Circuit Court of Brooke County's Stipulation and Order entered March 31, 2010, was "plainly right;"

2. That the legal standard for unauthorized practice claims differs for loans closed before and after November 17, 2010;

3. That there is an individualized fact specific inquiry for claims arising from loans closed before November 17, 2010; and

4. The class representative cannot adequately represent the interests of the class since he lacks a legitimate claim for the unauthorized practice of law.

With respect to the first argument, given this Court's determination that the closing of a real estate loan by a person who is not a licensed attorney, who is not acting under the direct supervision of a licensed attorney, and who is not a bona fide full-time lay employee performing legal services for his or her regular employer constitutes the unlawful practice of law since at least 2003, the fact that only a few class members' loans were closed after

the West Virginia Supreme Court of Appeals decided *McMahon v. Advanced Title Servs. of W.Va.* in 2010 is of no consequence and provides no basis to decertify the class.

With respect to the second argument, that the legal standard differs for loans closed before and after November 17, 2010, this Court's ruling also rejects this argument.

The third argument, that there is a fact specific inquiry for loans closed before November 17, 2010, is similarly unavailing.

Finally, the Movants' argument that the class representative cannot adequately represent the interests of the class since he lacks a legitimate claim for the unauthorized practice of law is also unavailing since the class representative has a claim for the unauthorized practice of law.

Based upon the foregoing the defendants' Motion to Decertify the Class **[Doc. 159]** is **DENIED**.

### Defendants Home Loan Center, Inc., HLC Escrow, and Harry J. Carenbauer's Motion for Partial Summary Judgment [Doc. 161]

As noted above, the defendants seek summary judgment as to Count I (Declaratory Judgment), in which plaintiff seeks an order decreeing that the practice of using non-lawyers not under the direct supervision of a licensed attorney constitutes the unauthorized practice of law; Count II (Contempt), in which plaintiff seeks an order holding defendants in contempt for the alleged unauthorized practice of law;  Count III (Injunctive Relief), which seeks an order enjoining defendants from engaging in the practice of law and violating the laws of West Virginia; Count IV (Conversion), in which plaintiff seeks recovery for HLC allegedly profiting or benefitting from monies that were placed under its supervision and control and that were property of the plaintiff, based on plaintiff's theory that money paid

to defendants as "true costs" were for unlawful, worthless or non-existent products or services; Count V (Overcharging), in which plaintiff seeks recovery for certain fees or expenses related to the loan transaction; Count VI (Breach of Fiduciary Obligations), in which plaintiff contends that the defendants breached a fiduciary duty owed to him in closing the loan; Count VII (Fraud/Intentional Misrepresentation), in which plaintiff contends that defendants allegedly engaged in the unauthorized practice of law and used an allegedly inflated appraisal; Count VIII (Misrepresentation by Concealment or Fraud), in which plaintiff seeks recovery for alleged concealment of material facts; Count IX (Negligent Misrepresentation), in which plaintiff seeks recovery for misrepresentations and omissions constituting negligent misrepresentation; Count X (Committing Unfair and Deceptive Trade Practices in Violation of W.Va. § 46A-1-101, et seq. (the "WVCCPA")), in which plaintiff claims that defendants engaged in the unauthorized practice of law, charged more than $2 total for Mr. Carenbauer's appearance, and originated a loan in excess of the value of Plaintiff's home;  Count XI (Violation of W.Va. § 37-17-1, et seq., the West Virginia Mortgage Lender, Broker and Services Act), in which the plaintiff seeks recovery for allegedly charging fees not permitted by the Act; Count XII (Civil Conspiracy), which is derivative of other claims;  Count XIII (Tort of Outrage), which defendants claim is derivative of other claims; Count XIV (Negligence), which defendants claim also is derivative of other claims;  Count XV (Class Action), in which plaintiff alleges that class action treatment is appropriate; and  Count XVI (Punitive Damages), in which plaintiff asserts that HLC and HLC Escrow's alleged conduct was willful, wanton, intentional and/or reckless.  The moving defendants seek summary judgment as to all claims concerning the alleged unauthorized practice of law and the alleged overcharging of notary services.

Specifically, consistent with the argument set out below, defendants seek summary judgment with respect to Counts I, II, III, IV, V, VI, VII, VIII, IX, XII, XIII, XIV, XV, and XVI in their entirety and with respect to those portions of Counts X and XI further specified herein. Defendants are not moving for dispositive relief based on plaintiff's appraisal-related claims, but reserve the right to so at an appropriate juncture.

The primary theories presented by the Motion are the unauthorized practice of law and the claim under the WVCCPA for overcharging for notary services. The only Counts which were conditionally certified for class treatment are Counts I, II, V and X. The remainder of the claims are presented on an individual basis.

With respect to Count I of the Complaint, the defendants contend that at the time that the Dijkstra loan was closed, May 25, 2005, it was not unlawful for a notary to provide "settlement services" at a loan closing. In light of this Court's prior determination that a notary can not and could not provide such services as of 2003, this portion of the motion will be denied.

The defendants also argue that there are no damages which emanate from the use of a notary to close the loan. In fact, the use of a notary foreclosed the opportunity that the plaintiff would have had to ask questions about the documents or the terms of the loan, which, in Mr. Dijkstra's case, resulted in his refinancing to a *higher* interest rate than he had prior to the refinancing.

The Motion will be denied with respect to Count I, seeking a declaratory judgment.

Count II of the Complaint asserts a claim for contempt as a result of the use of notaries to close loans. This aspect of the Motion will be granted. Prior to November 17, 2010, there was no court order in effect directly prohibiting the defendants from utilizing

19

notaries to close loans.  In the absence of such an order, contempt will not lie.  Admittedly, the defendants knew or should have known that the use of notaries to close loans was prohibited.  This falls short, however, of contempt.

Count III seeks injunctive relief preventing the defendants from continuing to engage in the unauthorized practice of law through the use of notaries to close loans.  Summary judgment on Count III will be denied.

Count IV does not appear to apply to the moving defendants.  To this extent the Motion will be granted.

Count V alleges that the defendants overcharged for the notary's closing services, noting that notaries are limited to a statutory fee of $2.00 for each notarial service.  The defendants claim that a notary is permitted to charge two dollars for each signature notarized; for each act of certifying, retaining, and recording facsimiles of a document; and for each other notarial act performed, W. Va. Code § 29C-4-301; and that notaries are permitted to charge for other services as provided by W. Va. Code §§ 59-1-7 and -11.

While these contentions may be accurate, the fact remains that the defendants did not charge on the basis of the statutory fees, but rather charged on a different basis, with the charges running from $90.00 to $275.00.  There is no authority for a notary to charge in this fashion.  Accordingly, the Motion shall be denied with respect to Count V.

Count VI alleges a breach of fiduciary duties.  The plaintiff has presented no basis for a claim of breach of fiduciary duties.  In **Knapp v. American Gen. Finance, Inc.**, 111 F.Supp.2d 758 (S.D. W.Va. August 16, 2000), then Chief Judge Haden held that:

> The fiduciary duty is "'[a] duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person.'" **Elmore**

*v. State Farm Mut. Automobile Ins. Co.,* 202 W.Va. 430, 435, 504 S.E.2d 893, 898 (1998) (quoting Black's Law Dictionary 625 (6th ed.1990)).  A fiduciary relationship exists "whenever a trust, continuous or temporary, is specially reposed in the skill or integrity of another." *McKinley v. Lynch,* 58 W.Va. 44, 57, 51 S.E. 4, 9 (1905).  "As a general rule, a fiduciary relationship is established only when it is shown that the confidence reposed by one person was actually accepted by the other, and merely reposing confidence in another may not, of itself, create the relationship." *Id.* (quoting C.J.S. Fiduciary at 385 (1961)).

As Defendants contend, the law does not generally recognize a fiduciary relation between creditor and debtor, the fundamental relation between Defendants and the Knapps. *See ARA Automotive Group v. Central Garage, Inc.,* 124 F.3d 720, 728 n. 13 (5th Cir. 1997); *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 53 (3d Cir. 1988) (creditor-debtor relationships rarely found to give rise to a fiduciary duty).  Plaintiffs counter, however, the Defendants exceeded the creditor-debtor relationship when they undertook to sell Knapps unnecessary property and life insurance, thus creating a quasi-fiduciary duty.  The case Plaintiffs cite for this proposition, however, finds its quasi-fiduciary relationship in the special circumstances and entire pattern of the dealings between an individual borrower and a savings and loan association.  *See Hutson v. Wenatchee Fed. Sav. and Loan Ass'n,* 22 Wash.App. 91, 588 P.2d 1192

(1978).  No unusual, special, or unique circumstances are alleged in the

Knapps' relation to Defendants beyond their contentions that the Knapps

were unsophisticated, uneducated borrowers, unable to determine for

themselves the terms of their loan agreements.

111 F.Supp.2d at 766.  *See also* ***Nowlan v. J.P. Morgan Chase Bank, N.A.***, 2012 WL

1029315 (S.D. W.Va. March 26, 2012) (Johnston, J.).

Summary judgment will be granted on Count VI.

It is unclear whether Count VII alleges a claim against the moving defendants.  This

Court will therefore grant summary judgment on this claim.  If this Court in some manner

misinterpreted the claim, counsel may file a motion to reconsider.

Count VIII alleges that the defendants fraudulently concealed the fact that certain

legal services provided were not done by lawyers or under the supervision of lawyers.  To

the extent that this relates to the closing, it is clear that Mr. Carenbauer disclosed at the

closing that he was a notary public and not a lawyer.  Summary judgment will be granted

on Count VIII.

Count IX alleges negligent misrepresentation under the facts alleged in Count VIII.

For the same reasons, summary judgment will be granted on Count IX.

Count X alleges that the defendants violated the West Virginia Consumer Credit

Protection Act, W.Va. Code § 46A-1-101, et seq.  Specifically, the plaintiff seeks damages

under West Virginia Code § 46A-5-101(1) for violations of §§ 46A-2-121 (unconscionability;

inducement by unconscionable conduct); 46A-3-109(a)(5) (requiring the purchase of

insurance from a particular company); and 46A-2-127(g) (fraudulent, deceptive or

misleading statements).

The defendants argue that the plaintiff has failed to comply with the requirements of West Virginia Code § 46A-6-106(b), which provides as follows:

Notwithstanding the provisions of subsection (a) of this section, no action may be brought pursuant to the provisions of this section until the consumer has informed the seller or lessor in writing and by certified mail of the alleged violation and provided the seller or lessor twenty days from receipt of the notice of violation to make a cure offer: *Provided,* That the consumer shall have ten days from receipt of the cure offer to accept the cure offer or it is deemed refused and withdrawn.

W.Va. Code § 46A-6-106(b).

This Court finds, however, that this subsection has no application to the plaintiff's claims. West Virginia Code § 46A-6-106(a), to which this subsection applies, provides that "[a]ny person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, *as a result of the use or employment by another person of a method, act or practice prohibited or declared to be unlawful by the provisions of this article* may bring an action in the circuit court of the county in which the seller or lessor resides . . .." It is clear that this subsection applies to methods, acts or practices found to be improper in Article 6 of Chapter 46A. Since the claims in this case are brought under Articles 2 and 3, the requirement of § 46A-6-106(b) has no bearing on those claims.

In *Petty v. Countrywide Home Loans, Inc.*, 2013 WL 1837932 (S.D. W.Va. May 1, 2013), Judge Chambers held that where a closing agent visited the home of unsophisticated borrowers and "instructed them to sign some papers, but provided them

23

with no meaningful explanation of the loan terms," such conduct states a claim for unconscionable inducement under West Virginia Code § 46A-2-121(1). This is especially true where the closing was rushed and hurried so the borrower went without sufficient explanation of the loan documents. *See Koontz v. Wells Fargo, N.A.*, 2011 WL 1297519 (S.D. W.Va. March 31, 2011) (Johnston, J.).

The defendants' Motion shall be denied as it pertains to Count X.

With respect to Count XI, the sole reference in defendants' memorandum is that "[i]t is possible that Count XI includes, at least in part, a similar premise [as Count X]." No other grounds are presented in support of the Motion with respect to Count XI. Accordingly, the Motion with respect to Count XI is denied.

Count XII alleges a civil conspiracy. The defendants' memorandum contains absolutely no argument with regard to Count XII. Therefore, the Motion is denied with regard to Count XII.

Count XIII alleges a claim for the tort of outrage. "In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." Syl. Pt. 3, *Travis v. Alcon Laboratories, Inc.*, 202 W.Va. 369,

504 S.E.2d 419 (1998).

"The first element of the cause of action is a showing by the plaintiff that the defendant's actions towards the plaintiff were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency. The defendant's conduct 'must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.' *Grandchamp v. United Air Lines, Inc.,* 854 F.2d 381, 383 (10th Cir.1988)." *Travis, supra*, 202 W.Va. at 375, 504 S.E.2d at 425.

"We discussed the type of conduct by a defendant that a plaintiff must show to prove 'outrageousness' in *Tanner v. Rite Aid of West Virginia, Inc.,* 194 W.Va. 643, 461 S.E.2d 149 (1995). Quoting from the comments to *Restatement of Torts (Second),* § 46, we stated:

d. Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community

would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam."

*Id.*, quoting ***Tanner***, 194 W.Va. at 650-51, 461 S.E.2d at 156-57.

This Court finds that the actions of the defendants could not reasonably be seen as meeting the standard for outrageous and extreme conduct. Accordingly, this Court will grant the defendants' Motion with regard to Count XIII.

Count XIV asserts a claim for negligence. A jury could find that the defendants knew or should have known that the use of a notary public to close residential loans was contrary to the law of West Virginia and that the plaintiff was harmed by that negligence. Accordingly, the Motion is denied with respect to Count XIV.

For the reasons stated above, Defendants Home Loan Center, Inc., HLC Escrow, and Harry J. Carenbauer's Motion for Partial Summary Judgment [**Doc. 161**] is **GRANTED** as to Counts II, IV, VI, VII, VIII, IX, and XIII and **DENIED** as to Counts I, III, V, X, XI, XII, and XIV.

**Plaintiff's Motion for Summary Judgment on Class Claims [Doc. 163]**

In Plaintiff's Motion for Summary Judgment on Class Claims [Doc. 163], the plaintiff seeks summary judgment on his class claims, being Count I (declaratory judgment); Count II (contempt); Count V (overcharging); and Count X (unconscionable inducement).

With respect to Count I and based upon the reasoning above with respect to defendants' Motion, this Court grants summary judgment on Count I and finds and declares that the defendants engaged in the unauthorized practice of law by using notaries to close loans.

With respect to Count II, seeking a finding of contempt, for the reasons stated above, the Motion is denied.

With respect to Counts V and X, again for the reasons stated above, this Court will grant summary judgment on both counts as to liability.

Accordingly, Plaintiff's Motion for Summary Judgment on Class Claims [**Doc. 163**] is **GRANTED IN PART AND DENIED IN PART**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** February 26, 2014.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE